WILLIAMS, J.
|,The defendant, Eddie L. Jackson, was charged by bill of information with second degree kidnapping, in violation of LSA-R.S. 14:44.1, and simple arson (damage $500 or more), in violation of LSA-R.S. 14:52. Following a jury trial, he was found guilty as charged. He was sentenced to serve 40 years at hard labor without the benefit of parole, probation or suspension of sentence for the second degree kidnapping conviction and 10 years at hard labor for the simple arson conviction. The sentences were ordered to be served concurrent with any other sentence. The defendant appeals his convictions. He also appeals one[1] of his sentences as con *519 stitutionally excessive. For the following reasons, we affirm.
FACTS
On January 24, 2011, at approximately 2:00 a.m., deputies of the Caddo Parish Sheriffs Office were dispatched to the scene of an unoccupied burning vehicle near Cooper Road in Shreveport, Louisiana. It was later discovered that the vehicle, a 2006 silver Dodge Charger, was owned by Tracy Winslow, with whom the defendant had a prior 15-year romantic relationship. Tracy was not found at the scene of the burning vehicle and her family has not seen or heard from her since the night of January 23, 2011.
The defendant and Tracy had three children together, Shicarra Winslow (16 years old), Damione Winslow (13 years old), and Ty’keonna | ¿‘Toucan” Winslow (6 years old).[2] The couple and their children had lived together in Oil City, Louisiana, in a home jointly purchased by Tracy and the defendant.
The relationship between the defendant and Tracy ended on or about November 24, 2010, Thanksgiving Day, when he repeatedly struck her on her head with a gun. The incident was witnessed by the couple’s three children.[3] Shicarra and Damione testified that after hitting Tracy, the defendant fired the gun “in the air” and threatened to kill Tracy and the children.[4] Shortly after the incident, Tracy ended the relationship, took her car, a 2006 silver Dodge Charger, and moved in with her mother, Maggie Winslow. Tracy applied for a three-bedroom apartment in her mother’s apartment complex. She also began a romantic relationship with Larry Wiggins (“Larry”), a resident of Shreveport.[5]
On the morning of Tracy’s disappearance, Detectives Scoggins and Hicks questioned the defendant. The defendant’s interview consisted of four components. During the first portion, the defendant made the following ^relevant statements:
• his cell phone was with him all day/evening on January 23, 2011;
• he and Tracy ended their relationship around Thanksgiving 2010;
• he last talked to Tracy that day on the phone at 5:00 p.m. or 6:00 p.m. on January 23, 2011;
• Tracy told him that she was heading towards Shreveport;
• he and his youngest daughter, Ty’keonna, visited family and friends that day;
• he dropped Ty’keonna off at his mother’s house at 3:00 p.m.;
*520 • he drove around for “a couple of hours” and returned home at 4:00 p.m. or 5:00 p.m.;
• Tracy sent him a text message at 8:00 p.m. or 8:30 p.m., asking about the location of Ty’keonna;
• he picked up two of his other children, Eddie and Edwina, at 10:00 p.m. or 11:00 p.m. from their mother’s home and took them home;
• he tried to call his brother; and
• he cleaned Ty’keonna’s toys out of his rental car.
During the second interview, the defendant stated:
• his nephew picked up Ty’keonna and took her to the apartment of Maggie Winslow (Tracy’s mother);
• he did not go anywhere else that night;
• a cashier from the EZ Mart convenience store called him and told him that Tracy’s car was burning on Cooper Road;
• he drove in his truck to Cooper Road and did not see anyone, so he returned home;
• when he got back home police officers were already there;
• he had deleted all of the text messages and entries from his cell |4phone call log;
• he and Tracy were “trying to work it out” and were going to counseling once a week “for spiritual guidance”;
• he did not remember the time of the call from the cashier from the EZ Mart;
• he did not know anybody on Cooper Road and did not like going there because “they had problems many years ago”;
During the third portion of the interview, the defendant stated:
• he did not talk to Tracy around midnight that night;
• he did not drive Tracy’s car to Cooper Road;
• he had called Tracy and left messages only;
• that he did not call anyone to pick him up on Cooper Road;
• “loved his baby mama and would not harm her”;
• he never “lost his cool”;
• he has “lost his cool”;
• he went to the Cooper Road area at approximately 2:00 a.m., after the deputy told him that Tracy’s car was found burning;
• someone picked him up on Cooper Road because his truck had broken down, which happened after the deputy came to his house and told him about the fire;
• he “loves his baby momma,” and “would never hurt her for the world”;
• he did not set a car on fire;
• his truck stopped at the apartments on Cooper Road;
• his children were at home alone when he drove to the Cooper Road location;
• Tracy owned a 9 millimeter gun and had it for two to three years;
Is* he would not harm Tracy because that would leave him to take care of three more children; he would be left with five children without a woman, and that “he could not do that”;
• the last time that he was in Tracy’s car was when they went to eat after church;
• he stayed at home all the time reading the Bible;
• he had been “seeking spiritual guidance since Tracy left,” and they both went to counseling; and
*521 • he did not know that Tracy had a boyfriend.
During the fourth portion of the interview, the defendant consented to a fingernail clipping and a DNA swab. Subsequently, the defendant’s cell phone records were subpoenaed. Data retrieved from cell-phone tower locations indicated that he had been following Tracy around Shreveport on the day of her disappearance; he had made phone calls near the home of Tracy’s boyfriend and near the home where Tracy and her boyfriend had attended a party that evening. Additionally, the records showed that the defendant was in the Cooper Road area, near the location of the burning car, at 1:59 a.m.
The defendant was charged by bill of information with second degree kidnapping and simple arson. A six-day jury trial was held, which revealed details of the sometimes volatile relationship between the defendant and Tracy, as well as some disturbing particulars which took place after their breakup.
Cherrie Alphard and her daughter, Tamika, and other friends and co-workers of Tracy, testified about an incident which took place in a park in December 2010, approximately one month before Tracy’s disappearance. |fiTamika testified as follows: she, her mother and Tracy were at the park sitting in Tracy’s car; the defendant repeatedly called Tracy, who refused to answer his calls; Tracy showed her text messages from the defendant in which he stated “that he would kill her”; when finally Tracy answered one of the defendant’s calls that day, she told him that she was at the park getting ice; the defendant drove to their location, parked his truck two to three inches away from Tracy’s car, jumped out, and grabbed/jerked Tracy’s window; the defendant shouted, “Don’t play with me bitch, I’ll break your neck in 18 different places.”
Cherrie Alphard also testified with regard to the park incident. She stated: the defendant came to the park, pulled next to Tracy’s car and began shaking her window; the defendant stated, “The next time I call, you better answer the phone. If you don’t, I’ll break your neck in 19 different places”; the defendant threw mail addressed to Tracy through the crack in her window and left the park.
Teressa Winslow, a cousin of both Tracy and the defendant, also testified. She stated: Tracy had confided to her details of her problems with the defendant; Tracy had allowed her to hear a threatening voi-cemail message the defendant had left on Tracy’s phone; she recognized the defendant’s voice on the message and he was “upset because [Tracy] was not answering the phone.” In describing the message, Teressa stated, “Just him stating that, you know, he would hurt her, and you know, what he would do to her.” She testified that she could tell that the message bothered Tracy “because she wouldn’t have let me listen to it if it didn’t.” Further, Teressa testified: she had seen the defendant and Tracy sitting separately at church |7the day Tracy disappeared; the defendant “seemed like something was bothering him”; the defendant “was in a daze, like he was there but he wasn’t there”; after church, the defendant took Ty’keonna with him; she saw Tracy at the grocery store after church and expressed her concern about the defendant’s demean- or in church; Tracy told her that the defendant was “upset because she didn’t ride to church with him”; Tracy told her she was not worried because she had a gun; Tracy showed her a gun in the glove compartment of her car; Tracy and Larry were in a relationship and Tracy was “absolutely” happy; Tracy had never expressed any fear or misgivings about her relationship with Larry; she has not seen *522 or heard from Tracy since Sunday, January 23, 2011.
The evidence also revealed that on January 23, 2011, at approximately 3:00 p.m., Tracy drove to Larry’s house. Later, she and Larry went to the home of Sabrina Harris, Larry’s cousin, to watch a football game.
Frederick Taylor testified that he and Larry were long-time friends and he knew Tracy through Larry. Taylor testified as follows: he went to Larry’s house at approximately 2:00 p.m., on January 23, 2011; Tracy arrived at Larry’s house with groceries at approximately 3:00 p.m.; at approximately 5:00 p.m., they left to go to Harris’ house to watch football; he did not notice if Tracy received any phone calls or text messages.
Chantelle Stephens, Taylor’s girlfriend, testified as follows: she met Tracy through Larry in “late November 2010;” she was a guest at Harris’ house on January 23, 2011; the men were in the front of the house watching a football game and the women were in the kitchen; she was sitting next to Tracy; Tracy’s phone rang “frequently”; Tracy answered the phone [«‘sometimes, and sometimes she didn’t”; Tracy appeared to be frustrated when she received the calls; she, Tracy and two other women left the house briefly to go to a fast food restaurant; Tracy continued to receive phone calls, most of which she did not answer; when they returned to Harris’ house, she heard Tracy talking on the phone to someone “with a male voice;” the person asked Tracy “where their youngest daughter was”; Tracy told the person her daughter was with her aunt, hung up and “silenced the phone again”; she has not seen or heard from Tracy since that night.
Sabrina Harris testified as follows: she and Larry are cousins; she met Tracy through Larry in October 2010; she had a “football house party” on January 23, 2011; Tracy and Larry attended the party; she noticed that Tracy’s phone kept ringing and “whoever it was that was on the other end, she kept screaming at them telling them something”; she could tell that Tracy was irritated; she did not know who was on the other end of the phone but she “could hear it was a dude, a guy”; she could not understand what Tracy was saying; Tracy received numerous calls and kept “hitting her ignore button on the phone”; Tracy and Larry left her house at approximately 11:00 p.m. On cross-examination, Harris testified that the person on the other end of the phone was screaming at Tracy, and Tracy was screaming back at them.
Larry testified that he heard Tracy’s phone ringing that evening and that he heard Tracy tell the defendant that “he was supposed to have Toucan.” He also stated that he heard the defendant tell Tracy that Toucan was not with him. Larry also testified that Tracy told him that the defendant was texting her that day. Further, Larry testified that Tracy asked him to go |sto Oil City with her, but he would not go because he knew the defendant was “going to be down there, and so it’s going to end up [with] me and him in an argument.”
At approximately 11:00 p.m., Tracy and Larry left Harris’ house, stopped by Larry’s house then went to a gas station. Afterwards, Tracy drove back to Oil City alone. Tracy called her mother’s house and spoke to Shicarra and Damione and told them that she was on her way home.
Larry testified that he was on the phone with Tracy during her drive home. He stated that Tracy arrived at home, and he heard her turn off and exit her car. Larry testified that he heard the defendant’s voice shouting and cursing at Tracy.[6] *523 Larry stated that he heard Tracy shouting back at the defendant, followed by a scuffling/crackling sound on the phone. He stated that Tracy told him twice that she would call him back. Larry never heard from her again. He testified that Tracy had never given any indication that she was planning to leave town.
Damione testified that he heard a noise resembling a “car burning out” emanating from the parking lot of their apartment complex. He stated that he called his mother’s phone, but did not receive an answer.
Mariah Jackson, Maggie Winslow’s next-door-neighbor, testified as follows: she saw Tracy’s car driving out of the apartment complex parking lot the night of January 28, 2011; the headlights were turned off and the vehicle was “leaving kind of faster than what she would drive it;” she was unable to see who was in the car; she did not know what time the car left the | i(lapartment complex.
Karen Milbrodt, record custodian with Verizon Wireless, testified that the following text messages were exchanged between the defendant (EJ) and Tracy (TW) that evening:
6:52 p.m. E J to TW Hey you got to get Tucán, no one down there to take her over Mag’s.
TW to EJ Ok.
6:59 p.m. EJ to TW Call me.
7:02 p.m. E J to TW You know, she got to go to school tomorrow.
7:10 p.m. TW to EJ I know she got to go to school. I’m fina come get her, but what you, you can’t get her?
7:11 p.m. EJ to TW I’m way you here in TX.
7:13 p.m. EJtoTW You with your n* * * *r, our baby comes first.
7:13 p.m. TW to EJ Whatever. I’m in Sport, but I’m fina to go get her. Don’t f*ekin worry about it.
7:15 p.m. EJ to TW Call me right now.
7:16 p.m. TW to EJ No, I’m fina to go get my baby. F* *k you. I could have brought her with me.
7:17 p.m. EJ to TW I don’t care if you’re with that p* ⅜ *y ass n* * * *r, our baby come first god dammit.
7:26 p.m. EJ to TW Get that n* * ⅜ *r d* *k out your mouth and go get my baby. Don’t call nobody to get her. You get her now.
TW to EJ F* *kyou.”
_]n7:29 p.m. EJ to TW That n* * * *r f* *Mng you? I hope you suck d* *k and die.
7:57 p.m. EJ to TW Go get my damn baby.
8:00 p.m. TW to E J No longer your baby. My baby and f* *k you.
8:05 p.m. EJ to TW F* *k you too, and you got to be with your n* * * *r to be talking shit.
8:08 p.m. TW to EJ That’s what you think. That’s why you acting like that, why I don’t like to deal with
8:12 p.m. EJ to TW Yeah, because you eussin me out. Don’t answer you phone. You ain’t never did that. Prove to me you’re not with a man, answer the phone. We was fine today.
8:27 p.m. E J to TW That’s how I know you with someone.
8:28 p.m. TW to E J Okay. Stop thinking] I’m with someone and do what you do.
8:30 p.m. TW to E J I’m gonna stop answer the phone, and you really going to think I’m with someone.
*524 8:30 p.m. EJ to TW K. You with your p* * *y ass n* ⅜ * *r. If you’re not, meet me then.
8:31 p.m. E J to TW That n* * * *r going to make you.
8:31 p.m. TW to E J If you say so.
8:33 p.m. EJ to TW Go ahead, I know how to GPS your ass now.
8:34 p.m. TW to E J K. Do it then. You want to meet me but you couldn’t go to get Tucán. I’ll see you when you get here.
1128:37 p.m. TW to EJ Don’t call me, GPS me.
8:37 p.m. EJ to TW I just left TX. That dude that was going to race did show up so everybody left, now meet me.
8:38 p.m. TW to E J GPS me.
8:30 p.m. E J to TW Meet me if you’re not with your man.
8:40 p.m. E J to TW And you got it off.
8:44 p.m. EJ to TW You don’t meet me, you will be sorry so please me.
8:45 p.m. TW to EJ You gonna be sorry.
8:45 p.m. EJ to TW K. I asked nicely.
8:46 p.m. EJ to TW And I love you.
8:47 p.m. TW to E J Do you know what you saying?
8:48 p.m. EJ to TW Nothing. I just kiddin. Just meet me.
8:48 p.m. TW to EJ No, so leave it alone.
8:49 p.m. EJ to TW Call me then.
8:53 p.m. EJ to TW Can’t leave that ni* * * *r.
9:06 p.m. EJ to TW Man, I just f* *king with you. I’m still in TX, we going to race.
9:13 p.m. EJ to TW So you not going to be at home when my baby have to bath and go to bed? Tell me now.
11:42 p.m. EJ to TW Still with that n* * * *r I see.
During the trial, the state presented evidence to piece together the following time-line:
• On January 23, 2011, at 11:00 p.m., the defendant, wearing a 113dark shirt and dark-colored jeans, drove a Kia rental car to the only EZ-Mart in Oil City and purchased gas.[7]
• At 12:22 a.m. (January 24, 2011), the defendant, wearing different clothes— a red shirt and light-colored jeans— drove back to the EZ-Mart in his gray work truck and purchased gas.
• At 1:38 a.m., the defendant called a relative, Donyell Malong, and asked him for a ride because “his truck had broken down.” Malong testified that the defendant did not tell him where he was located.
• At 1:35 a.m., the defendant called Ma-long again and told him that he no longer needed a ride because his truck was “running.”
• At 1:45 a.m., Deputy Devin Pickett of the Caddo Parish Sheriffs Office drove through the Lakeview neighborhood area in Shreveport while on patrol. He testified that he did not see a car and did not see a car on fire.
• At 1:52 a.m., the defendant called Ma-long, asked him for a ride again, told him that he was on Roy Road, and “that he had a service call.”
• At 1:58 a.m., the defendant called Ma-long.
• At 2:07 a.m., the defendant called Ma-long.
*525 • At an unspecified time 15 to 20 minutes prior to 2:26 a.m., Virginia Wailes, an employee for KCS Railroad was driving on North Lakeshore Drive.[8] She testified that she did not see Tracy’s vehicle or any form of “illumination.”
• At 2:23 a.m., the defendant called Ma-long.
• At 2:24 a.m., the defendant called Ma-long.
• At 2:26 a.m., while driving in a reverse route to North Lakeshore Drive, Wailes saw a car burning and called _1⅛911.[9]
• At 2:27 a.m., Deputy Adam Jacobo, of the Caddo Parish Sheriffs Department, was dispatched to a vehicle fire at North Lakeshore Drive and Kuhn Road.
• At 2:46 a.m., Deputy Jacobo arrived as the first officer on the scene of the vehicle fire; the fire department personnel had already extinguished the flames. He testified that he began investigating the whereabouts of Tracy Winslow.
• At 2:58 a.m., Deputy Pickett arrived at the scene of the vehicle. He testified that he immediately recognized Tracy’s vehicle and called Tracy, the defendant, and Consuela Green, the cashier at the only EZ Mart in Oil City.
• At 3:09 a.m. and 3:10 a.m., Consuela Green called the defendant’s cell phone, but he did not pick up; she did not leave a voicemail message. Moments later, the defendant called back. Green told him about Tracy’s car being on fire in Shreveport. She testified that the defendant did not come to the EZ Mart store or ask for the location of Tracy’s car.
• At or about 3:13 a.m., Deputy Dennis Williams, of the Caddo Parish Sheriffs Office, drove to the defendant’s home. He testified that he saw a green car with big rims (“the Hulk car”) in the driveway. He knocked for three to four minutes and saw the defendant arrive driving a blue and gray Z-71 Chevrolet pickup truck with the words “Reliable Tire Service” written on the side.[10] Deputy Williams followed (driving) the defendant to Maggie Winslow’s apartment and told the defendant to call Deputy Jacobo.
• At 3:20 a.m., Deputy Pickett called the defendant and left a voicemail message about Tracy’s car; the defendant called him right back. Deputy Pickett testified that although the defendant told him that he was at home |1Basleep, it actually sounded like he was driving at the time. Deputy Pickett told the defendant that “his wife’s car had been burned up.” The defendant stated that he had not seen her that day, but had heard from her via text message at 8:00 p.m.[11]
*526 • Around 3:20 a.ra., the defendant called Deputy Jacobo and told him that he last saw Tracy that day between 2:00 p.m. and 3:00 p.m., that he last spoke to her between 5:00 p.m. and 6:00 p.m., that she drove to Shreveport, and that he received a text message from her at 8:00 p.m.[12]
• At 3:36 a.m., the defendant and Deputy Williams were still together when the defendant asked Deputy Williams for the location of Tracy’s car.
• At 3:50 a.m., the defendant called Deputy Pickett.[13]
At trial, Donyell Malong testified as follows: he and his girlfriend picked the defendant up on Roy Road, Shreveport Blanchard Highway, that night; the defendant was wearing a red shirt and blue jeans; he did not see the defendant’s work truck; the defendant told him that his work truck was “in a safe place” and “that he (the defendant) was going to come back and get it the next day;” the defendant lived 10 to 15 minutes away from where he was picked up; he did not see the defendant’s gray truck at his (the | ^defendant’s) house; he saw the “broken down work truck” at the defendant’s house; the defendant had wrecked his Dodge Magnum and was driving a rental car at the time.[14]
Detective Scoggins testified with regard to Tracy’s cell phone records. He stated that the last registration for Tracy’s phone was January 23, 2011 at 11:42 p.m., at a location east of the only cell-phone tower located in Oil City, Louisiana. Detective Scoggins also testified that he investigated the location of one of the defendant’s cellphone calls. He stated:
The analyst told me there was a phone call received on [the defendant’s] phone at 1:59 a.m., and we learned — we learn more and more each time we deal with the phone companies, you know, what they can and what they can’t do for us. I asked [the analyst] if he could give me a distance. I had never before in my life had asked that. He did give me a distance of — for the location of that handset for that telephone at 1:59 a.m. that morning as about 6/10ths of a mile south of a cell tower. An address for the cell tower is, I believe, was 2555 Roy Road. That cell tower is almost at the intersection of Roy Road and Louisiana Highway 173. Ms. Winslow’s car was found burning about 7/10ths of a mile directly south of that cell tower. So that puts [the defendant] very close to the vehicle that was set afire around the time it was set afire.
*527 Fire Marshall Investigator Charles Edwards conducted an investigation of Tracy’s charred vehicle. He testified as follows: the entire dashboard of the vehicle melted into the floorboard; Tracy’s car keys, radio and a gas can were found inside the car, but that there was no presence of ignitable substances; the presence of the radio generally indicated that the charred vehicle was not a stolen vehicle; the origin of the fire was the |17vehicle’s front passenger’s or driver’s floorboard, and the cause of the fire being an “incendiary, open flame introduced by human design;”[15] the amount of damage to the vehicle exceeded $500;[16] the title of the vehicle listed Tracy Winslow as being the owner and listed her address as being 140 Thomas Street, Oil City, Louisiana 71061;[17] the 20-minute timeline by Virginia Wailes was well within the timeline of using common combustibles and being an incendiary fire;[18] he walked the 1.1 miles between the location of Tracy’s car and the place where the defendant was picked up; it took him 20 minutes and 31 seconds.
John Minor, a communications expert and consultant, was tendered as an expert in the field of communications. He provided information regarding the defendant’s phone records and how cell phones work.[19] Minor | ^testified that on the day of Tracy’s disappearance, the vast majority of the defendant’s phone calls went to the cell phone sites closest to the home of Larry Wiggins in Shreveport. He stated that had the defendant been at his home in Oil City, the calls would not be dispatched to those cell phone towers in Shreveport. *528 Minor also testified that the defendant’s cell phone records indicate that he was in the area of the homes of Larry Wiggins and Sabrina Harris that evening.
Minor also testified that Larry called Tracy at 11:42 p.m., and the cell phone tower associated with this call was the cell phone tower that covers the Oil City area.[20] He also stated that at 10:51 p.m., the defendant’s cell site was the tower in Oil City. Minor testified that the defendant’s 11:27 p.m. and 11:31 p.m. phone calls were transmitted to the cell site northeast of Cross Lake, which indicated that the defendant could have been in Oil City, where Tracy’s mother lived, at that time. He testified that the defendant’s phone calls during the time period of 1:52 a.m. to 2:24 a.m. were through the cell site located on North Lakeshore Drive.
Corporal Robert Greer, of the Caddo Parish Sheriffs Department, testified that he performed a data retrieval for electronic evidence on a 119computer located in the defendant’s home. He stated that on January 6, 2011, between the hours of 1:00 a.m. and 2:00 a.m., someone was on that computer viewing a site about how to perform GPS tracking through cell phones. Cpl. Greer also testified that around that same time, someone from that computer was looking into Tracy’s email account.
Pastor James T. Sims and Tammy Jackson testified as witnesses for the defense. Pastor Sims testified that neither Tracy nor the defendant were members of the church he pastored, but Tracy “would attend occasionally.” Pastor Sims also testified that the defendant called him in early January 2011 and asked if he would “talk to them[.]” He further testified that he provided counseling for the defendant and Tracy and that he had talked to the defendant more than Tracy because the defendant “was initiating the whole concept, the whole counseling deal.” On cross-examination, Pastor Sims testified that he had “heard rumors” about issues of domestic violence between the defendant and Tracy. However, he stated that neither the defendant nor Tracy talked to him about alleged violence. According to Pastor Sims, he believed the couple was “making progress.” He stated that he had seen the defendant and Tracy in church the day she disappeared and he was surprised when he learned what had happened. He admitted that “behaving appropriately in the presence of a pastor does not indicate that a person is incapable of committing a crime of violence.”
Tammy Jackson (the defendant’s sister) testified that the defendant and Tracy had a “great relationship,” and she did not know of any serious issues between the two. She also testified that she was “extremely shocked” when they separated. She admitted that she did not live with the defendant | Pnand Tracy and she did not know what went on in their house. Jackson also denied having knowledge of threatening phone calls or text messages from the defendant to Tracy.
At the conclusion of the trial, the jury found the defendant guilty as charged. As stated above, he was sentenced to serve 40 years at hard labor on the second degree kidnapping conviction without benefit of probation, parole or suspension of sentence. He was also sentenced to serve 10 years at hard labor on the simple arson conviction; the sentences were ordered to be served concurrently. The defendant did not file a motion to reconsider sentence.
The defendant appeals his convictions and one of his sentences.
*529 DISCUSSION
The defendant contends the evidence was insufficient to support his convictions. He argues: (1) the state did not present any eyewitnesses to his alleged commission of these crimes; (2) there were no valid samples taken from the scene of the alleged crime that matched his DNA; (3) there was no fingerprint analysis to place him at the scene of the burned vehicle; (4) there was no evidence of physical injury or sexual abuse to Tracy on January 28, 2011; and (5) none of the witnesses had direct evidence that he destroyed the vehicle or kidnapped Tracy.
The standard of appellate review for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921. This standard, now legislatively embodied in LSA-C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Dorsey, 2010-0216 (La.9/7/11), 74 So.3d 603. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins, 2003-1980 (La.4/1/05), 898 So.2d 1219; State v. Cunningham, 46,664 (La.App.2d Cir.11/2/11), 77 So.3d 477.
The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. LSA-R.S. 15:438. However, that rule does not establish a stricter standard of review than the “rational juror’s reasonable doubt” formula, but, instead, provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence. State v. Wright, 445 So.2d 1198 (La.1984); State v. Sutton, 436 So.2d 471 (La.1983); State v. Christopher, 561 So.2d 935 (La.App.2d Cir.1990), writ denied, 567 So.2d 1124 (La.1990).
When a conviction is based on circumstantial evidence, such evidence must exclude every reasonable hypothesis of innocence. LSA-R.S. 15:438; State v. Brown, 47,050 (La.App.2d Cir.5/16/12), 92 So.3d 579; State v. Baker, 46,089 (La.App.2d Cir.3/2/11), 58 So.3d 571. A jury acting as the fact finder may reasonably reject the hypothesis of innocence offered by the defendant unless that hypothesis is sufficiently reasonable and sufficiently strong that a reasonable trier of fact must necessarily entertain a reasonable doubt about guilt. State v. Swanzy, 2012-1297 (La.4/1/13), 110 So.3d 549; State v. Captville, 448 So.2d 676 (La.1984); State v. Mosley, 46,756 (La.App.2d Cir.12/16/11), 80 So.3d 1164, writ denied, 2012-0117 (La.5/4/12), 88 So.3d 462. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond reasonable doubt. State v. Wright, supra; State v. Christopher, supra.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s *530 decision to accept or reject the testimony of a witness in whole or in part. State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.

Second Degree Kidnapping

Kidnapping is: (1) the forcible seizing and carrying of any person from one place to another; or (2) the enticing or persuading of any person to go from one place to another; or (3) the imprisoning or forcible secreting of any person. LSA-R.S. 14:44.1(B). Pursuant to LSA-R.S. 14:44.1 (A), second degree kidnapping is the commission of any of the acts listed in LSA-R.S. 12fjl4:44.1(B), wherein the victim is:
(1) Used as a shield or hostage;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
(3) Physically injured or sexually abused;
(4) Imprisoned or kidnapped for seventy-two or more hours[;] or
(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
Second degree kidnapping is a general intent crime. State v. Cerda-Anima, 12-682 (La.App.5th Cir.5/30/13), 119 So.3d 751. General criminal intent exists “when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.” LSA-R.S. 14:10(2).
Tracy’s body was not found and no one witnessed her death; therefore, there was no direct evidence that she was killed. However, after a thorough review of this record, we find that there was ample circumstantial evidence presented from which the jury could find that the defendant was guilty of the crimes charged.
The evidence revealed a violent dating history between Tracy and the defendant. Their children testified that they saw the defendant hit Tracy on her head with a gun, and that he fired the gun inside their home. Cherrie and Tamika Alphard testified that the defendant threatened to “break Tracy’s neck in [several] places” in December 2010, less than one month before she ^disappeared. Tamika also testified that Tracy had shown her a text message in which the defendant had threatened to kill her. Teressa Winslow testified that she heard a threatening voi-cemail message from the defendant to Tracy because the defendant was angry that Tracy was not answering her cell phone.
The state also introduced evidence of the text messages exchanged between the defendant and Tracy on the evening of January 23, 2011. During the exchange, the defendant demanded that Tracy meet him. He also informed her that he knew “how to GPS [her] now” and he stated, “You don’t meet me, you will be sorry[.]”
Additionally, the defendant’s cell phone records revealed that he followed Tracy around Shreveport the afternoon of her disappearance, making calls and/or sending text messages that transmitted from towers located near the residences of Larry Wiggins and Sabrina Harris. The phone records also indicate that the defendant left Oil City and headed towards Shreveport at 11:27 p.m., traveling the only highway leading from Oil City to Shreveport. Meanwhile, Tracy, who had called home to talk to her children at 11:28 p.m., was traveling that same highway— from Shreveport to Oil City. It is highly likely that the defendant and Tracy passed *531 each other because the defendant’s cell phone records show that his direction changed at 11:31 p.m., from the south-facing antennas to the north-facing antennas. The evidence establishes that at that point, the defendant abandoned his plan to return to Shreveport and followed Tracy back to Oil City. The defendant’s next call, made at 11:44 p.m., shows that he was back in Oil City, where he called Tracy; she did not answer because, by that time, she hflwas on the phone with Larry, her boyfriend.[21]
Further, Larry testified that he talked to Tracy during her drive from Shreveport to Oil City on January 23, 2011. He stated that he was still on the phone with her when she arrived at her mother’s apartment complex and he heard her turn off her car. At the same time that he heard the “dinging” sound of the car door being opened with the keys in the ignition, he heard the defendant’s voice. Larry testified that the defendant was shouting, cursing and demanding to know why Tracy had not answered his calls. He also testified that he heard Tracy shouting back, followed by a scuffling/crackling sound on the phone. Larry testified that he has not seen or heard from Tracy since that phone call. Thus, defendant’s argument that the jury was not presented with any evidence of abusive behavior towards Tracy on the night of January 23, 2011 is not supported by the evidence.
Tracy’s children testified that she called them around 11:00 p.m. and told them that she would be home soon. Damione testified that he heard a noise resembling a “car burning out” emanating from the parking lot of their apartment complex. He stated he called his mother’s phone, but he did not receive an answer. Mariah Jackson, a neighbor, testified that she saw Tracy’s car speeding out of the apartment complex with its headlights turned off. Jackson felt the car was moving faster than she has ever seen Tracy drive.
Cpl. Greer testified that on January 6, 2011, weeks before Tracy’s disappearance, the computer in the defendant’s home had been used to | ^search for information on how to perform GPS tracking through cell phones. Cpl. Greer also testified that the same computer had been used to access Tracy’s email account. Although the defendant performed computer research on cell phone GPS tracking, sadly, he failed to research how that same technology could be used to place him at the location of the kidnapping and arson.
Moreover, the defendant’s statements to police officers were contradicted by the evidence. For example, he stated that he did not know that Tracy had a boyfriend. However, in his text messages to Tracy on the evening of her disappearance, he made numerous explicit references to the fact that she was dating someone else. He also gave explicit descriptions of the man and call him that “p-ass n-” and “her man.” Additionally, the defendant stated that he had not seen Tracy since they went to eat after church that day. However, as stated above, the defendant’s cell phone records show that he had been tracking Tracy the evening of her disappearance, as he had made calls from near Larry’s house and from near Harris’ house that night. Furthermore, the cell phone records indicate that the defendant made a phone call from the Cooper Road area of Tracy’s burning car at 1:59 a.m., prior to the time the 911 phone call was made. Therefore, we find that the evidence was sufficient for *532 the jury to conclude, beyond a reasonable doubt, that the defendant forcibly seized Tracy from the parking lot of her mother’s apartment complex and carried her to another location, or that the defendant imprisoned or forcibly secreted Tracy.
No one has seen or heard from Tracy since the night she disappeared; she did not return home to her mother and children as she had planned, andj^she did not report to work the following day or any day since. Thus, although there was no direct physical evidence that Tracy was kidnapped, we find that the above-referenced circumstantial evidence was sufficient to establish that, at the very least, the defendant forcibly seized Tracy and imprisoned her for 72 hours or more.

Simple Arson

Simple arson is either (1) the intentional damaging by any explosive substance or the setting fire to any property of another, without the consent of the owner; or (2) the starting of a fire or causing an explosion while the offender is engaged in the perpetration or attempted perpetration of another felony offense even though the offender does not have the intent to start a fire or cause an explosion. LSA-R.S. 14:52. Simple arson is a general intent crime. State v. Simmons, 443 So.2d 512, 521 (La.1983); State v. Martin, 2004-924 (La.App.5th Cir.1/25/05), 895 So.2d 55.
We note that there is no direct evidence linking the defendant with the burning of Tracy’s vehicle. However, there are multiple facts which can be inferred from the evidence presented. In his statements to police officers, the defendant denied being in the area of Tracy’s burning vehicle that night. However, his cell phone records tell an entirely different story. The defendant’s cell phone records indicate that he was still in Oil City at 1:33 a.m. when he first called Donyell Malong to tell him that his work truck had broken down in Shreveport and that he needed a ride home. Approximately 25 minutes later, 1:52 a.m., the defendant called Malong again asking him to pick him up on Roy Road in Shreveport. Thereafter, the defendant made two additional calls to Ma-long. These calls were made from Shreveport, ^approximately one mile from the site where Tracy’s burning car was found. When Malong picked the defendant up, he did not see the defendant’s work truck in the area. Malong dropped the defendant off at home in Oil City. Approximately 35 minutes later, when the police officers arrived at the defendant’s home looking for Tracy, the defendant did not answer the door. Minutes later, he arrived, driving the work truck that had allegedly broken down in Shreveport. From these facts, the jury could have inferred that the defendant drove Tracy’s car to the remote area, started the fire, walked away from the site and then called Malong to pick him up from the site. Accordingly, after viewing the facts inferred from the circumstances, in a light most favorable to the prosecution, we find that any rational trier of fact could have found, beyond a reasonable doubt, that the defendant committed the. crime of simple arson.

Evidentiary Ruling

The defendant contends the trial court erred in admitting evidence of prior crimes and/or bad acts. He argues that the trial court erroneously allowed the state to introduce the following testimony and evidence: (1) text messages attested to by Karen Milbrodt (records custodian for Verizon) between the defendant and Tracy; (2) testimony from Tamika Alphard and her mother, Cherrie Alphard, pertaining to the December 2010 park incident; and (3) testimony from Teressa Winslow pertaining to a particular voicemail left by the defendant. More specifically, the defendant argues that the text messages *533 from Verizon contained argumentative and vulgar language and were introduced to show his “jealous and possessive” nature. He also maintains that the testimony from Tamika, Cherrie and Teressa was | ^elicited to demonstrate his bad character. According to the defendant, neither the text messages nor the testimony proved motive, opportunity or intent to commit kidnapping or arson, and the prejudicial effect of the evidence outweighed its probative value.
Generally, a trial court’s ruling on the admissibility of evidence of other crimes will not be overturned absent an abuse of discretion. State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); State v. Humphries, 40,810 (La.App.2d Cir.4/12/06), 927 So.2d 650, writ denied, 2006-1472 (La.12/15/06), 944 So.2d 1284. This same standard is applied to rulings on the admissibility of other crimes evidence. State v. Wright, 2011-0141 (La.12/6/11), 79 So.3d 309; State v. Cosey, 97-2020 (La.11/28/00), 779 So.2d 675; State v. Humphries, supra.
Evidence is relevant when it tends to make the existence of any fact material to the disposition of the matter more or less probable than it would be without the evidence. LSA-C.E. art. 401. However, even if relevant, such evidence may still be excluded if its probative value is substantially outweighed by the danger that it will cause unfair prejudice, confusion of issues, undue delays, and wasted time, or that it will mislead the jury. LSA-C.E. art. 403.
Courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. LSA-C.E. art. 404(B)(1); State v. Rose, 2006-0402 (La.2/22/07), 949 So.2d 1236; State v. Howard, 47,495 (La.App.2d Cir.11/14/12), 106 So.3d 1038. Evidence of other crimes, wrongs or bad acts committed by the defendant is generally inadmissible because of the “substantial risk of grave prejudice to the defendant.” State v. Prieur, 277 So.2d 126, 128 (La.1973). However, the state may introduce such evidence if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. LSA-C.E. art. 404(B)(1). The state must provide a criminal defendant with reasonable notice in advance of trial if it intends to offer such evidence. LSA-C.E. art. 404(B)(1); State v. Prieur, supra.[22]
*534 Even when other crimes evidence is offered for a purpose allowed by LSA-C.E. art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant’s defense. State v. Rose, supra; State v. Martin, 377 So.2d 259 (La.1979). The state also bears the burden of proving that defendant committed the other crimes, wrongs or acts. State v. Galliano, 2002-2849 (La.1/10/03), 839 So.2d 932.
Although a defendant’s prior bad acts may be relevant and otherwise admissible under LSA-C.E. art. 404(B), the court still must balance the probative value of the evidence against its prejudicial effects before it can be admitted. LSA-C.E. art. 403. Any inculpatory evidence is “prejudicial” to a defendant, especially when it is probative to a high degree. State v. Germain, 433 So.2d 110, 118 (La.1983). “Prejudicial,” in this context, means that probative evidence of prior misconduct is excluded only when it is unduly and unfairly prejudicial. Id.; Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).
In the instant case, the key inquiry is whether the evidence of the defendant’s prior bad acts was relevant to serve some independent purpose, apart from showing merely that the defendant was a “bad person.” The state’s Prieur notice made references to the defendant’s “motive, intent, and plan for the charges of second degree kidnapping and simple arson.”
The testimony regarding the defendant’s prior bad conduct against Tracy negated any claim that he intended only to frighten, not injure, her. The defendant had repeatedly threatened to harm Tracy. He had threatened to kill her and to “break her neck” in several places. Additionally, in a text message to Tracy mere hours before she disappeared, the defendant warned her that she would “be sorry” if she did not meet him. Moreover, the defendant’s text messages contradicted his statements to law enforcement officers, during which he denied knowing that Tracy was dating someone else. Based on this record, we find that the trial court correctly concluded that the evidence at issue proved that the defendant had motive, intent and |S2planned to commit the crimes charged. Consequently, the trial court did not abuse its discretion in admitting the evidence of defendant’s prior bad acts at trial.
This assignment of error lacks merit.

Excessive Sentence

The defendant also contends the sentence of 40 years at hard labor without any benefit of parole, probation or suspension of sentence for the second degree kidnapping conviction is excessive.[23] He argues that although the trial court had the benefit of a pre-sentence investigation (“PSI”) report, it did not refer to the report or give any considerations to any mitigating factors. According to the defendant, he did not deserve the maximum sentence and “[t]he goals of punishment and rehabilitation can best be accomplished with a less severe sentence.”
As stated above, the defendant was sentenced to serve 40 years at hard labor, without benefit of probation, parole or suspension of sentence for the second degree kidnapping conviction. He did not file a motion to reconsider his sentence.
LSA-R.S. 14:44.1(0 provides:
Whoever commits the crime of second degree kidnapping shall be imprisoned *535 at hard labor for not less than five nor more than forty years. At least two years of the sentence shall be without benefit of parole, probation, or suspension of sentence.
When a defendant fails to timely file a motion to reconsider sentence under LSA-C.Cr.P. art. 881.1, the appellate court’s review is limited to the Unbare claim of constitutional excessiveness. State v. Mims, 619 So.2d 1059 (La.1993); State v. Boyd, 46,321 (La.App.2d Cir.9/21/11), 72 So.3d 952.
An excessive sentence argument is reviewed by examining whether the trial court adequately considered the guidelines established in LSA-C.Cr.P. art. 894.1 and whether the sentence is constitutionally excessive. State v. Preston, 47,273 (La.App.2d Cir.8/8/12), 103 So.3d 525; State v. Gardner, 46,688 (La.App.2d Cir.11/2/11), 77 So.3d 1052.
Under constitutional review, a sentence can be excessive, even when it falls within statutory guidelines, if the punishment is so grossly disproportionate to the severity of the crime that it shocks the sense of justice and it is the purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Preston, supra; State v. Fatheree, 46,686 (La.App.2d Cir.11/2/11), 77 So.3d 1047.
A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. State v. Zeigler, 42,661 (La.App.2d Cir.10/24/07), 968 So.2d 875.
The trial court has wide discretion in imposing sentence within minimum and maximum limits allowed by the statute; thus, a sentence will not be set aside as excessive unless the defendant shows that the trial court abused its discretion. State v. Hardy, 39,233 (La.App.2d Cir.1/26/05), 892 So.2d 710; State v. Young, 46,575 (La.App.2d Cir.9/21/11), 73 So.3d 473, writ denied, 2011-2304 (La.3/9/12), 84 So.3d 550.
As a general rule, maximum or near maximum sentences are reserved liufor the worst offenders and the worst offenses. State v. Cozzetto, 2007-2031 (La.2/15/08), 974 So.2d 665; State v. McKinney, 43,061 (La.App.2d Cir.2/13/08), 976 So.2d 802. However, the reviewing court does not determine whether another sentence would have been more appropriate, but whether the trial court abused its discretion. State v. Esque, 46,515 (La.App.2d Cir.9/21/11), 73 So.3d 1021, writ denied, 2011-2347 (La.3/9/12), 84 So.3d 551.
In the instant case, a sentencing hearing was held on November 9, 2012. Prior to imposing the sentence, the trial court stated:
This Court has heard the argument of both the State and defense counsel. This Court has heard all of the testimony herein regarding sentencing. This Court has also reviewed the PSI report in the matter submitted regarding sentencing. In accordance with Article 894.1 of the Code of Criminal Procedure the Court also finds that the defendant’s actions show deliberate cruelty to the victim.
The Court also finds that the defendant’s actions have resulted in significant loss to the victim’s family; her children, her mother, as well as the defendant’s children, and the Court also takes into account the criminal history of the defendant^] In accordance with Article 894.1 of the Code of Criminal Procedure this judge notes that any lesser sentences would deprecate the seriousness of the defendant’s crimes. Further, this Court does not find that *536 the defendant has expressed any genuine remorse.
The sentence imposed, while the maximum sentence, was within the statutory limits. Additionally, although it was unnecessary in this case, the record reveals adequate compliance with LSA-C.Cr.P. art. 894.1, as the trial court expressly referred to the guidelines and recited relevant factual considerations. The court noted the defendant’s cruel actions and the loss to his family and Tracy’s family. Further, the court noted the defendant’s IsfiCriminal history and his lack of remorse.
We find that the trial court did not abuse its vast discretion in imposing the maximum sentence for this defendant. This sentence does not shock the sense of justice and is not excessive.
This assignment lacks merit.

Ineffective Assistance of Counsel

The defendant has filed a pro se brief, in which he asks this Court to review the record for errors patent, in accordance with LSA-C.Cr.P. art. 920. He also contends he was denied effective assistance of counsel during his trial. However, the defendant does not present any errors or omissions to prove that his counsel was ineffective.
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief (“PCR”) in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under LSA-C.Cr.P. art. 930; State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Mitchell, 37,916 (La.App.2d Cir.3/3/04), 869 So.2d 276, writ denied, 2004-0797 (La.9/24/04), 882 So.2d 1168. However, when the record is sufficient, an appellate court may resolve this issue on direct appeal in the interest of judicial economy. State v. Mitchell, supra.
A claim of ineffective assistance of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish that his attorney was ineffective, the defendant first must show that |S(icounseI’s performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel’s representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland, supra. The assessment of an attorney’s performance requires his conduct to be evaluated from counsel’s perspective at the time of the occurrence. Id.
Second, the defendant must show that counsel’s deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. Strickland, supra. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel’s unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Strickland, supra; State v. Pratt, 26,862 (La.App.2d Cir.4/5/95), 653 So.2d 174, writ denied, 95-1398 (La.11/3/95), 662 So.2d 9.
A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel *537 which led to the claim. General statements and conclusory charges will not suffice. Strickland, supra; State v. Jordan, 35,643 (La.App.2d Cir.4/3/02), 813 So.2d 1123, writ denied 2002-1570 (La.5/30/03), 845 So.2d 1067.
In this case, the defendant made a conclusory contention that his trial counsel was ineffective. However, he failed to make any specific allegations |37or provide any instances where his counsel’s performance was deficient. Therefore, the defendant has failed to meet the first prong under Strickland. Consequently, the defendant’s assignment of error is meritless.
ERRORS PATENT
Our review of this record for errors patent revealed that the trial court failed to impose the mandatory $15,000 fine for the simple arson conviction. LSA-R.S. 14:52(B) provides, “[WJhoever commits the crime of simple arson, where the damage done amounts to five hundred dollars or more, shall be fined not more than fifteen thousand dollars and imprisoned for not less than two years nor more than fifteen years.”[24] The trial court imposed a sentence of 10 years; however, it failed to impose the fine.
Pursuant to LSA-C.Cr.P. art. 882(A), an illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review. However, as this Court has recognized, this Court is not required to take such action. See, State v. Jones, 42,531 (La.App.2d Cir.11/7/07), 968 So.2d 1247; State v. Griffin, 41,946 (La.App.2d Cir.5/2/07), 956 So.2d 199. The state did not object to the error and the defendant was not prejudiced in any way by the trial court’s failure to impose the mandatory fine. Accordingly, we decline to remand this case for resentencing.
CONCLUSION
For the foregoing reasons, the defendant’s convictions and sentences are affirmed.
J^CONVICTIONS AFFIRMED; SENTENCES AFFIRMED.

. On appeal, the defendant has only challenged the sentence for second degree kidnapping as constitutionally excessive.

. The defendant also had custody of two of his other children, who lived with Tracy and him. At the time of trial, Eddie Lewis was 17 years old and Edwina Lewis was 20 years old.

. Shicarra testified that she saw the defendant hitting Tracy over the head with a gun because of "something in her (Tracy’s) phone." She also stated that she witnessed him shooting the gun (a 9-millimeter handgun) twice in the house and he threatened to kill "everyone.” Damione testified that his sister woke him up and he heard his parents arguing. He also testified that he saw the defendant hitting Tracy and that the defendant shot his gun "in the air" inside the home. Damione stated that the defendant stated that he would kill them.

. During his interview with the detectives on the night of Tracy’s disappearance, the defendant denied the incident, stating that it "didn’t happen." Later, he stated, ”[T]hat was in the privacy of our own home."

. Witnesses testified that Tracy began dating Larry Wiggins in 2010, while she was still living with the defendant. According to one witness, Tracy and the defendant "had split up, but she was still living with him at the time."

. Larry testified that he recognized the defendant’s voice because Tracy would sometimes *523 use her speaker phone function during her phone conversations with the defendant.

. The state introduced two CD's from the EZ Mart surveillance cameras. The videos were played for the jury and entered into evidence.

. Wailes testified that approximately 15-20 minutes had elapsed between the time she first drove near the location and the second time she drove by and saw the burning car.

. Wailes testified, “Well, whenever I saw it was fire, I turned into North Lakeshore, there at the edge, and put my lights on bright to see if there was anybody there because by the time I got to the road, I could tell there was a car burning, and looked to see if there was anybody. I could not see anybody around though.” A copy of this 911 call was received into evidence as State Exhibit No. 54 and was played for the jury.

. A patrol video from Deputy Williams’ patrol car was entered into evidence as Exhibit 55 and was played in open court.

. Deputy Jacobo testified, "He (Jackson) didn’t act the way I would have acted if my wife’s car would have been burned up. I mean, I would have been en route on the way *526 down there. And he (Jackson) was just like, okay.”

.Deputy Jacobo testified, “I asked Mr. Jackson if he knew who Tracy Winslow was, and he said it was his girlfriend. And I asked him, when was the last time he saw her? He said he saw her, I believe it was on the 23rd which was a Sunday between 2:00 and 3:00, he said was the last time he saw her. I believe he said the last time he spoke to her was between 5:00 and 6:00 p.m. on Sunday. And he also told me that she informed him that she was on her way to Shreveport, but wouldn't tell him why she was going to Shreveport. And then he told me that he had received a text from her about 8:00 asking him if he had gotten the babies, and that was pretty much it. And he said that they were having problems in their relationship, but they were trying to make it work.”

. Deputy Pickett testified, “He asked me did I think he needed to come down here, and I said yes, but he was like he's not going to come down (to the location of the burning car).”

. Herbert Robinson, the former owner of Budget Rent-A-Car franchise in Shreveport, testified that the defendant rented a silver Kia Optima on January 21, 2011, at 5:38 p.m. (with the mileage at 33,824) and returned the vehicle at January 25, 2011 (with the mileage at 34,923).

. Investigator Edwards stated that the fire did not originate from the trunk, the glove compartment area, or underneath the car.

. Investigator Edwards stated that the value of the custom rims on the vehicle alone exceeded $500.00.

. Edwards provided testimony concerning documents from Safeway Auto. State Exhibit No. 108. Felicia Holden testified that she never saw the defendant driving the car. Shi-carra testified that her mother continued to drive the car when they moved in with her grandmother. Damione testified that his mother continued driving her Dodge Charger after leaving his father and that she kept it at his grandmother’s (Maggie Winslow) apartment. Tamika Alphard testified that Tracy drove the silver Charger exclusively as her main vehicle and stored items in the car. Larry testified that Tracy drove a Dodge Charger.

. Edwards testified, "The actual time that it would take, if you did want to use acceler-ants, is unknown. But the 20-minute time-line that she (Wailes) gave us is well within that possibility. Like I said, we’ve had smoldering fires that you light and it smolders for two or three hours before it sustains a flame to cause a fire. But the 20-minute timeline that she (Wailes) gave us in this particular case, on that particular day in this investigation, the 20 minutes is well within the time-line of using common combustibles and being an incendiary fire.”

.Minor explained:
[C]ell phones often use the nearest location of the handset to transmit and receive data, as I've indicated here. It's not always the strongest signal or closest cell site, but it’s usually within an area nearest to the cell phone handset!.] [A]nd once [a cell phone is] booted up, it begins to scan with its radio receiver to see what cell sites it sees in. an area. It will create a list that we call — we’ll call genetically, ‘the neighbor list[.]' It will determine not only the signal strength, but we’ll call it ‘signal quality.' There are a number of factors that it is reviewing. And it will continue to monitor every six to 12 seconds. It happens — because it’s a computer, it happens. You don’t see any of this. It monitors again, and refreshes the list. And it will change who’s at the top signal quality level, depending upon those variety of factors and a bunch of calculations and so forth, and maintain that neighbor list. Before your phone engages in a call, or texting, or data, it will register to the best 'signal quality.’

. Minor stated that the term “cell site” encompasses the cell tower.

. Larry’s cell phone records indicated that he was at home during his last phoné call to Tracy.

. In the instant case, on October 25, 2011, the state notified the defense that it intended to introduce at trial evidence of the park incident. The 404(B) Notice provided:
In December 2010, the defendant, Eddie Lee Jackson, confronted Tracy Winslow at the Earl Williams Park in Oil City, Louisiana. Eddie Lee Jackson drove up to and nearly ran into Tracy Winslow’s vehicle. The defendant walked up to the driver side of her vehicle where she was seated and grabbed the driver side window. The defendant then told Tracy Winslow that he would break her neck if she left him. This incident was witnessed by Cherrie Alphard and Tamika Alphard. The purpose of this evidence is to show the defendant’s motive, intent, and plan for the charges of Second Degree Kidnapping and Simple Arson.
Thereafter, on July 27, 2012, the state notified the defense that it intended to introduce at trial evidence of threats by the defendant to Tracy. This notice provided:
During the time period of November 2010 through January 2011, Tracy Winslow had expressed concerns about her safety and relayed threats made to her by the defendant Eddie Lee Jackson. She also indicated that she believed the defendant had been following her when she traveled to the Shreveport, Louisiana area. This information was communicated to Tamika Alphard, Cherrie Alphard, Teressa Winslow, and Felicia Holden[.]

. As stated above, the defendant did not appeal the sentence imposed for the simple arson conviction.

. The fire investigator testified that the value of the custom rims on Tracy’s vehicle, alone, exceeded $500.